**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **Mark R. [1],** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 7:19–CV–804** |
| | ) | |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Mark R. ("Mark") filed this action challenging the final decision of the Commissioner of Social Security finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433; R. 12-36. Specifically, Mark claims that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) weigh the medical opinions in the record, namely the opinion of his treating psychiatrist, Richard Leggett, M.D; (2) assess his mental impairments; and, (3) assess allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 10) and **DENYING** Mark's Motion for Summary Judgment (Dkt. 8).

## STANDARD OF REVIEW

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

The court limits its review to a determination of whether substantial evidence supports the Commissioner's conclusion that Mark was not disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This standard of review requires the Court to "look[ ] to an existing administrative record and ask[ ] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). "The threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

On May 3, 2016, Mark filed a Title II application for a period of disability and DIB, alleging his disability began on August 10, 2015. R. 177–79. Mark alleged disability due to bipolar disorder, anxiety disorder, depression, hearing loss in left ear, memory deficits, easily overwhelmed and inability to handle stress, acid reflux, high blood pressure, and high cholesterol. R. 211. Mark's last date insured was December 31, 2020; he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. R. 208. The state agency denied Mark's application at the initial and reconsideration levels of

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

administrative review. R. 78, 93. On September 19, 2018, ALJ Thomas Erwin held a hearing to

consider Mark's claim for DIB. R. 37–65. Counsel represented Mark at the hearing, which

included testimony from vocational expert Asheley Wells. Id. On November 26, 2018, the ALJ

entered his decision analyzing Mark's claims under the familiar five-step process[3] and denying

his claim for benefits. R. 12–36.

The ALJ found that Mark met the insured status requirements through December 31,

2021 and had not engaged in substantial gainful activity since the alleged onset date of August

10, 2015. R. 17. The ALJ found that Mark suffered from the severe impairments of bipolar

disorder with depression, anxiety, hypertension, and right shoulder impingement.[4] Id. The ALJ

determined that these impairments, either individually or in combination, did not meet or

medically equal a listed impairment. R. 18. The ALJ specifically considered listing 1.02 (major

joint dysfunction), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and

obsessive-compulsive disorders), and 4.00H1 (general cardiovascular listing). R. 18–19. The

ALJ found that Mark had moderate limitations in understanding, remembering, and applying

information; a mild limitation in interacting with others; a moderate limitation in concentrating,

persisting, or maintaining pace; and, a moderate limitation in adapting or managing himself.

R. 19-20.

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence,
whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the
requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform
other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520);
Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant
disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of
proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the
Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the
claimant's age, education, work experience, and impairments, to perform available alternative work in the local and
national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[4] The ALJ found Mark's alleged hearing loss, near-sightedness, high cholesterol, acid reflux, and left-knee
injury to be non-severe. R. 23.

The ALJ concluded that Mark retained the residual functional capacity ("RFC") to perform unskilled, medium work. R. 21. Specifically, Mark can perform simple, routine tasks in a job with no more than occasional changes in the work setting, and without strict production rates or pace requirements. Id. Mark should have no exposure to unprotected heights and no more than occasional exposure to other hazards. Id.

The ALJ determined that Mark could not perform any past relevant work including work as a pharmacist. R. 29. The ALJ identified jobs in significant numbers in the national economy that Mark could perform, including positions as a hospital cleaner, warehouse worker, and floor maintenance worker. R. 30. Thus, the ALJ determined that Mark was not disabled. Id. Mark appealed the ALJ's decision and the Appeals Council denied his request for review on October 17, 2019. R. 1–6.

## ANALYSIS

Mark alleges that the ALJ failed to properly weigh the medical opinions in the record, assess his mental impairments and assess his allegations regarding his symptoms. Mark has several mental impairments, including bipolar disorder, depression, and anxiety.[5] R. 17. Mark generally claims that these mental impairments prevent him from performing even unskilled work. R. 22.

### A. Medical History Overview

Mental Health Evidence

Mark received regular psychiatric treatment from Richard Leggett, M.D., for mental health conditions, including bipolar disorder and generalized anxiety disorder, since at least September 24, 2012, several years before the alleged disability onset date. R. 409–35, 542.

---

[5] Mark's allegations of error do not relate to his physical opinions and are, therefore, not discussed in the opinion. In short, Mark suffers hypertension and right shoulder impingement. R. 17.

Mark's alleged disability onset date coincides with his placement on FMLA after making several mistakes at work. R. 361. Prior to this date, Mark regularly complained of workplace stressors and occasionally reported memory problems. R. 361, 363, 364, 367, 370. Mark continued to complain of workplace stressors and memory problems after the alleged onset date. R. 347–49, 351–54, 360, 410, 455, 542. Though Dr. Leggett noted that Mark's memory was a bit variable in late 2015, Dr. Leggett noted gradual improvement, and by September 6, 2018, wrote that Mark's memory is "generally functional in non-stressful environment[s]." R. 542. Mark maintained a consistent medication regimen while under Dr. Leggett's care. See R. 24.

Beginning on August 29, 2015, Mark began attending regular counseling sessions with Ronald Salzbach, a licensed clinical social worker. R. 379–408. In their initial sessions, Mr. Salzbach reported that Mark was anxious, especially about his placement on FMLA. R. 403–08. Mr. Salzbach reported Mark's functioning as "poor" during several of his November 2015 appointments, while listing symptoms of depression, anxiety, and poor memory function. R. 399–401. During Mark's December 2015 through May 2016 sessions, Mr. Salzbach often noted that Mark's overall function was "variable," despite presenting a variety of symptoms, including anxiety, depression, and feelings of guilt. R. 381–94. In their conversations, Mark considered the possibility of finding part-time employment. R. 382, 384–85, 398.

Medical Opinion Evidence

In August 2015, Mark's former employer, Lewis Gale Medical Center, referred him for a "Fitness for Duty Evaluation" after he made multiple mistakes on the job. R. 484. Counselor J. Steve Strosnider, M.A., conducted several inventories, ultimately concluding that Mark had bipolar disorder and presented with overt anxiety and depression. R. 484–86. Mr. Strosnider concluded that Mark was not fit for duty. R. 486. The ALJ assigned Mr. Strosnider's report significant weight. R. 27.

In November 2015, Mark's counselor, Mr. Salzbach, completed a medical certification form for Mark's FMLA. R. 446–49. Mr. Salzbach concluded that Mark's "cognitive impairments [including bipolar disorder, anxiety, and disorganized thinking made] it unsafe" for Mark to return to work as a pharmacist. R. 449. The ALJ assigned this conclusion significant weight. R. 27.

In October 2016, Mark's psychiatrist, Dr. Leggett, completed a Statement of Ability to Do Work-Related Activities (Mental). R. 436–40. Dr. Leggett determined that Mark had mild limitations with remembering work-like procedures, understanding and remembering both simple and detailed instructions, carrying out both simple and detailed instructions, maintaining regular attendance, sustaining an ordinary routine, making simple work-related decisions, and responding appropriately to changes in routine work settings. R. 437–38. Dr. Leggett found that Mark had moderate limitations with working in coordination or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically-based symptoms, performing at a consistent pace without unreasonable rest periods, and getting along with co-workers without unduly distracting them. Id. Dr. Leggett found that Mark had an "extreme" limitation in his ability to deal with either normal work stress or stress of semiskilled or skilled work. R. 436-40. Dr. Leggett further concluded that Mark would miss more than three days of work per month due to his impairments. R. 440. The ALJ assigned less weight to Dr. Leggett's report.[6] R. 28.

Opinions of State Agency Examiners

---

[6] The ALJ gave some weight to Dr. Leggett's GAF scores of 55 to 72 in the aggregate. R. 28. The GAF Scale is used by mental health professionals to rate overall functioning on a hypothetical continuum of 1 to 100. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Rev. 2000). A score of 100 is the most high-functioning. A GAF score of 51-60 indicates moderate symptoms. A GAF score of 61-70 indicates mild symptoms or difficulty.

In August 2016, state agency physician Leslie Montgomery, Ph.D., reviewed the record and found that Mark's affective and anxiety disorders were severe impairments, noting however, that "[Mark's] condition results in some limitations . . . [but] is not severe enough to stop him from working." R. 76. Dr. Montgomery recorded moderate limitations in sub-categories within understanding and memory, sustained concentration and persistence, and adaptation. R. 73–75. Upon reconsideration in March 2017, Richard Luck, Ph.D., affirmed Dr. Montgomery's conclusions. R. 85–89. Dr. Luck noted that Mark had mild limitations in the following areas: ability to understand, remember, or apply information; ability to adapt or manage himself; and, ability to interact with others. R. 86. Dr. Luck reported that Mark had a moderate limitation in his ability to concentrate, persist, or maintain pace. Id. Peter Bradley, Ph.D., conducted further review in 2017. R. 442–45. He agreed with the assessments of Drs. Montgomery and Luck. Id. The ALJ gave significant weight to the opinions of the state agency psychological consultants. R. 26.

## B.  Treating Psychiatrist's Opinion

Mark argues that the ALJ's decision to give less weight to Dr. Leggett's medical opinion is not supported by substantial evidence. Pl.'s Br. at 20–25, 29, Dkt. 9. Mark asserts that the ALJ improperly discounted Dr. Leggett's opinion given its consistency with his prior treatment notes and with other medical opinions in the record. Pl.'s Br. at 21–22, Dkt. 9.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."[7] 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir.

---

[7] The social security regulations regarding the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017. See 20 C.F.R. §§ 404.1520c, 416.920c (setting out rules for claims filed on or after March 27, 2017, including that no specific evidentiary weight, including controlling weight will be given to

2001); Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 269 (4th Cir. 2017) ("[T]he ALJ is

supposed to consider whether a medical opinion is consistent, or inconsistent, with other

evidence in the record in deciding what weight to accord the opinion."). Thus, "[b]y negative

implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent

with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater,

76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording

controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2);

Saul v. Astrue, No. 2:09-cv-1008, 2011 WL 1229781, at *2 (S.D.W. Va. March 28, 2011).

Further, if the ALJ determines that a treating physician's medical opinion is not deserving

of controlling weight, the following factors must be considered to determine the appropriate

weight to which the opinion is entitled: (1) the length of treatment and frequency of examination;

(2) the nature and extent of the treatment relationship; (3) the opinion's support by medical

evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating

physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5). "None of these

factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's

opinion." Ricks v. Comm'r, No. 2:09-cv-622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29,

2010).

Here, the ALJ appropriately considered these factors and the record. The ALJ considered

Dr. Leggett's opinion and found that it was inconsistent with his own treatment notes, stating:

"[t]he disabling limitations imposed in this form-based assessment are at odds with the global

assessment of functioning ("GAF") scores assigned by Dr. Leggett throughout the period at

---

any medical opinions). However, as this claim was filed prior to the effective date of the amended rule, I will apply
the rules in 20 C.F.R. §§ 404.1527(c), 416.927.

issue."[8] R. 28. The ALJ noted Mark's long-term treatment relationship with Dr. Leggett but found that Dr. Leggett's opinion that Mark had "extreme" limitations[9] in dealing with normal work stress conflicted with the moderate GAF scores Dr. Leggett assigned throughout Mark's treatment history. Id. The ALJ further emphasized that despite an increase in visits immediately after Mark's alleged onset date, Mark quickly returned to his regular, quarterly treatment schedule with Dr. Leggett in early 2016. R. 24, 28. Since that time, the medical record reflects a regular, conservative course of treatment—suggesting moderate, as opposed to extreme, limitations. See id.

The ALJ also found that Dr. Leggett's opinion citing extreme limitations is not supported by Mark's reports of broad activities of daily living despite his ongoing symptoms. R. 25. The ALJ noted that, among other activities, Mark performed in his church orchestra (though he reports difficulty in learning new music), demonstrated an "ability to travel significant distances" on family vacations, and, before a recent knee injury, ran two to three times per week. R. 24–25. The ALJ noted that these activities demonstrate that Mark "is not totally unable to tolerate normal work stress." R. 28. Moreover, the ALJ found Mark's statement to Dr. Leggett that he "wishe[d] he could go back to work but then he would lose his availability to participate in current church activities" was inconsistent with extreme limitations dealing with stress. R. 26.

Finally, the ALJ considered Dr. Leggett's opinion together with the opinions of the other treating and reviewing doctors. Though all physicians agree that Mark is incapable of handling the stressors associated with being a pharmacist, the other medical opinions concluded that Mark has less severe limitations with handling normal work stress. R. 26–28.

---

[8] The ALJ also noted that Dr. Leggett's claim that Mark will miss more than three days of work per month is not well supported. R. 28 (explaining that Dr. Leggett provides no narrative explanation for this conclusion).

[9] Importantly, an "extreme" limitation is defined on the form as a "major limitation . . . [suggesting a patient has] no useful ability to function in this area." R. 436.

Mark argues that Dr. Leggett's opinion should be given more weight because it is consistent with Mr. Strosnider's report. Pl.'s Br. at 21, Dkt. 9. However, Mr. Strosnider's report, written mere weeks after the alleged onset date, suggests only that Mark is unable to return to work as a hospital pharmacist. R. 484–86. Moreover, Mr. Strosnider's report found that Mark's cognition was generally normal for his age. Id.  Mark also asserts that Mr. Salzbach's report supports Dr. Leggett's conclusion. Pl.'s Br. at 22, Dkt. 9. Similarly, although Mr. Salzbach noted that Mark had symptoms of anxiety and memory difficulties throughout treatment, Mr. Salzbach's statements regarding Mark's capacity for future work were focused on Mark's prior work as a hospital pharmacist. R. 24, 27.

Thus, contrary to Mark's contention, the ALJ did provide sufficient analysis of the factors outlined in 20 C.F.R. § 416.927(c)(2). See Hendrix v. Astrue, No. Civ. A 1:09–01283, 2010 U.S. Dist. LEXIS 90922 (D.S.C. Sept. 1, 2010) ("[A]n express discussion of each factor is not required so long as he applied the § 404.1527(d) factors and provides good reasons for his decision."); Overcash v. Astrue, No. 5:07–cv–123, 2010 WL 590434, at *6 (W.D.N.C. May 21, 2010). The ALJ specifically considered Mark's long-term treatment relationship with Dr. Leggett and justified the amount of weight afforded to Dr. Leggett's opinion with specific reasons, including the inconsistency between Dr. Leggett's medical opinion and his treatment notes. R. 27–28. The ALJ considered Mark's broad activities of daily living, which suggest an ability to tolerate at least some level of work stress. R. 25, 28. The ALJ also considered the other medical opinions in the record, and found that Dr. Leggett's opinion regarding the severity of Mark's limitations differed from the conclusions of the three state agency psychologists and did not clearly correspond with Mark's generally conservative, stable course of treatment. R. 24, 26–28. Finally, the ALJ recognized Dr. Leggett's specialization as a psychiatrist, but noted that the three state agency psychologists, "[have] specialized expertise and understanding of the Social

Security Administration's disability programs . . . [and] are well positioned to evaluate a person's longitudinal history." R. 23, 27. Having reviewed the record as a whole, I conclude that substantial evidence supports the ALJ's decision to give the opinion of Dr. Leggett less weight.

### C.  Mental Impairments Under SSR 96-8P

Mark argues that the ALJ failed to properly assess his mental impairments as required by SSR 96-8P. See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).[10] Specifically, Mark asserts that the ALJ failed to properly consider his moderate limitations in concentrating, persisting, or maintaining pace,[11] address his ability to sustain work over an eight-hour workday, and provide proper hypotheticals to the vocational expert. Pl.'s Br. at 18–19, 28, Dkt. 9.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR

---

[10] Social Security Rulings are "final opinions and orders and statements of policy interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Id; Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

[11] Mark also alleges, in multiple instances, that "[t]he ALJ's RFC findings do not address [his] moderate limitations in . . . understanding, remembering, or applying information, and moderate limitations in adapting or managing himself." Pl.'s Br. 18, 19, 26, 27. Despite the frequency in which Mark raises this claim, he provides no argument to specifically support it. See id. Nevertheless, I conclude that the ALJ adequately supported his findings on both these counts. Regarding Mark's ability to understand, remember, or apply information, the ALJ, though noting some abnormalities in "thought process[] and memory," found that Mark's mental status was stable and that the overall record showed "no evidence of psychosis, good insight, and appropriate judgment." R. 24. The ALJ further considered Mr. Strosnider's finding shortly after the alleged onset date that Mark had "normal to slightly above normal cognitive functioning for [his] age" and Dr. Leggett's more recent treatment notes confirming that Mark's "memory is generally functional in a non-stressful environment." R. 24–25. Regarding Mark's ability to adapt or manage himself, the ALJ acknowledged Mark's inability to work as a hospital pharmacist. R. 24. The ALJ also recognized, however, that since the alleged onset date that Mark's mental status and treatment were stable and consistent, and also that Mark proved capable of engaging in "fairly broad activities of daily living despite his ongoing symptoms." R. 24, 28.

96-8P at \*7; <u>Meadows v. Astrue</u>, No. 5:11-cv-63, 2012 WL 3542536, at \*15–16 (W.D. Va. Aug.

15, 2012) (citing <u>Davis v. Astrue</u>, No. 9-cv-2545, 2010 WL 5237850, at \*5 (D. Md. Dec. 15,

2010)); <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must

"build an accurate and logical bridge from the evidence to his conclusion" and holding that

remand was appropriate when the ALJ failed to make "specific findings" about whether the

claimant's limitations would cause him to experience his claimed symptoms during work and if

so, how often).

In <u>Shinaberry v. Saul</u>, the Fourth Circuit clarified that an "ALJ cannot summarily

'account for a claimant's limitations in concentration, persistence, and pace by restricting the

hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform

simple tasks differs from the ability to stay on task.'" No. 18-2096, 2020 WL 908887, at \*4 (4th

Cir. 2020) (quoting <u>Mascio v. Colvin</u>, 780 F.3d 632, 638 (4th Cir. 2015)). However, <u>Mascio</u> does

"not impose a categorical rule that requires an ALJ to always include moderate limitations in

concentration, persistence, or pace as a specific limitation in the RFC." <u>Id</u>. In contrast,

<u>Shinaberry</u> highlights "sister circuits" who conclude that "limiting the hypothetical to include

only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or

pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine

tasks, or unskilled work, despite [these] limitations." <u>Id</u>. (quoting <u>Winschel v. Comm'r of Soc.

Sec.</u>, 631 F.3d 1176, 1180 (11th Cir. 2011)). <u>Shinaberry</u> further confirms that <u>Mascio</u> does not

broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace

always translates into a limitation in the RFC, but instead underscores the ALJ's duty to

adequately review the evidence and explain his decision. <u>See</u> <u>also</u> <u>Monroe</u>, 826 F.3d 176

(emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what

evidence he found credible and specifically applying the law to the record).

Contrary to Mark's argument, the ALJ adequately supported his findings that Mark could sustain unskilled tasks over a normal workday, and he accounted for Mark's moderate impairments in his hypothetical questions to the vocational expert and the RFC finding in his ruling. The ALJ found that Mark had moderate impairments in concentration, persistence, or pace, noting that "[t]his area of functioning concerns actions that demonstrate the ability to focus attention on work activities and stay on task at a sustained rate." R. 19. While the ALJ acknowledged that Mark was "clearly preclude[d] . . . from returning to his mentally demanding past work as a hospital pharmacist" due to the "high-stress environment" and the presence of "abrupt changes" between shifts, he concluded that Mark was capable of "the basic mental demands of unskilled work," specifically work "limited to simple routine tasks in a job with no more than occasional changes in work setting." R. 23–24. The ALJ specifically noted that the RFC imposes specific restrictions with respect to strict production or pace requirements ("such as keeping up with an assembly line or having to meet strict production quotas") based on Mark's testimony about his prior employment and the medical evidence suggesting that stressful situations tend to exacerbate his memory difficulties. R. 24.

The ALJ noted that since leaving his hospital pharmacy job, Mark's treatment has been conservative and stable. Id. Furthermore, Mark engaged in a broad range of daily activities, including attending church meetings, participating in the church orchestra, completing woodworking projects, taking several foreign and domestic vacations, and participating in semi-regular exercise (before his knee injury).[12] R. 25. The ALJ found that Mark's ability to engage in this diverse array of day-to-day activities—despite ongoing mental health symptoms—supports the conclusion that Mark can meet the mental demands of unskilled work. R. 22–29.

---

[12] The ALJ also considered Mark's own "wish" to return to work. R. 26.

13

The ALJ also considered medical and medical opinion evidence. The ALJ found that despite claims of memory defects and abnormalities in mood, affect, and thought processes, Mark's mental status examinations show his capacity for good insight, appropriate judgment, and a functional memory in non-stressful environments. R. 24–25. The ALJ also cited the opinion of state agency psychologist Dr. Montgomery (and affirmations by Drs. Luck and Bradley), who found that Mark could "perform at a pace generally consistent with others, with only minimal need for accommodations on an infrequent basis." R. 26–27.

Mark also argues that the ALJ failed to address his ability to sustain work over an eight-hour day. Although the ALJ found that Mark had moderate limitations in concentration, persistence, or pace, he found no corresponding limitation in the ability to stay on task. R. 19–20. This outcome is specifically contemplated by Mascio and Shinaberry—provided the ALJ explains his reasoning. See Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020); Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015). Mark compares this case to Rice v. Comm'r, where the court remanded to the Commissioner noting that the ALJ's analysis "entirely faile[d] to address [claimant's] ability to sustain work over an eight-hour workday." Pl.'s Br. at 18–19, Dkt. 9; Rice, No. SAG-16-2582, 2017 WL 2276947 *3 (D. Md. May 24, 2017). Here, the ALJ provided sufficient analysis of Mark's ability to sustain work, discussing both Dr. Montgomery's medical opinion that Mark could "maintain concentration and attention for two hour periods in order to complete an eight hour day," and "would be able to complete a normal work week" as well as the medical records reflecting that Mark has been able to participate in a broad variety of activities. R. 26–28. Further, the ALJ relied upon Mr. Strosnider's report that Mark has "normal to slightly above normal cognitive functioning for his age" and a "generally functional" memory in "non-stressful environment[s]." R. 24–27.

Finally, Mark argues that the ALJ failed to "give any hypotheticals to the vocational expert that addressed [his] ability to sustain work over the course of an eight-hour workday and did not provide any hypotheticals to the ALJ that alerted the vocational expert to consider [his] moderate limitations." Pl.'s Br. at 26, Dkt. 9. The ALJ is not required to pose hypothetical questions to the vocational expert relating to impairments not supported by the record.[13] See Russell v. Barnhart, 58 F. App'x 25, 30 (4th Cir. 2003); Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (stating vocational expert's opinion must be in response to hypothetical questions that "fairly set out all of claimant's impairments"). As previously described, the state agency examiners specifically found that Mark would be able to maintain concentration and attention for two-hour periods and could complete an eight-hour day. R. 26–27. The ALJ also found that Dr. Leggett's conclusion that Mark would be absent from work more than three times a month was discounted by both his own assigned GAF scores and the lack of any narrative explanation. R. 27–28.

Mark's contention that the ALJ failed to give hypotheticals regarding his moderate impairments—specifically, concentration, persistence, or pace, understanding, remembering, or applying information, and adapting or managing—is similarly unavailing.[14] See R. 26–27. At the administrative hearing, the ALJ asked the vocational expert if jobs existed in the national economy for an individual who can perform medium work involving

> [S]imple, routine tasks [with] [n]o more than occasional changes in the work setting [and] eliminat[ing] those jobs that have strict production rate or pace requirements, whether that's keeping up with an assembly line or just having to

---

[13] Moreover, the ALJ did ask if jobs existed for an individual who "would miss three or more days of work per month." R. 62. Mark's counsel similarly asked about the off-task time tolerated by employers. R. 63. The Fourth Circuit has determined that any possible defects in an ALJ's hypothetical are cured when the plaintiff's attorney is given the opportunity to pose questions to the vocational expert. See Shively v. Heckler, 739 F.2d 987, 990–91 (4th Cir.1984) ("Although it might have been prudent for the ALJ to pose the questions himself, any possible defect was cured by the attorney's questions.").

[14] As previously noted, Mark does not provide any specific arguments supporting the ALJ's failure to address understanding, remembering, or applying information and adapting or managing.

make a certain number of objects or something every hour or every day where
there's essentially strict production quotas.

R. 61.

Mark asserts that the restrictions of simple, routine tasks did not address his moderate
limitations. Pl.'s Br. at 26–28, Dkt. 9. Mark relies on Widener v. Berryhill, where the court found
that an ALJ adopted the vocational expert's opinion without offering "any rationale for omitting
moderate limitations in concentration, persistence, and pace . . . in his hypothetical questions"
given that medical opinions from the state agency consultant specifically referenced an inability
"to perform activities on a consistent basis as [the claimant] has a marked impairment." 7:17-cv-
225, 2018 WL 847250 *3–4 (W.D. Va. Feb 13, 2018). Here, unlike Widener, the medical
opinions of the state agency consultants do not reference any such inability. See R. 26-27.
Moreover, the ALJ in this case supported his findings with the record. See Mascio, 631 F.3d at
638 ("[T]he ALJ may find that the concentration, persistence, or pace limitation does not affect
[the claimant's] ability to work, in which case it would [be] appropriate to exclude it from
the hypothetical tendered to the vocational expert."); Shinaberry ("When medical evidence
demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite
limitations in concentration, persistence, and pace, courts have concluded that limiting
the hypothetical to include only unskilled work sufficiently accounts for such limitations.").

Here, the ALJ's reasoning rests on the opinions of the state agency psychologists and a
detailed consideration of record evidence. This court is not "left to guess about how the ALJ
arrived at his conclusions." Mascio, 780 F.3d at 637. As such, I conclude that substantial
evidence supports the ALJ's conclusions regarding Mark's RFC.

**D.  Subjective Allegations**

Mark argues that the ALJ's assessment of his allegations is not supported by substantial

evidence. Specifically, Mark complains that the ALJ incorrectly weighed the evidence, ignoring

evidence from Dr. Leggett and Mr. Salzbach regarding Mark's functioning.[15] Pl.'s Br. at 29, Dkt.

9. Mark also argues that the activities of daily living referenced by the ALJ do not actually show

he is capable of completing an eight-hour workday, including "attending church meetings and

services, playing his trumpet in the orchestra, trying to help with chores at home, woodworking

projects, and traveling with his family on vacations." Pl.'s Br. at 30, Dkt. 9. Mark relies upon his

testimony that he gets distracted when performing chores, is a beat behind the other musicians in

the orchestra, that his church involvement and woodworking activities are flexible, and his

family vacations are intermittent. Id.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step

analysis when considering a claimant's subjective statements about impairments and symptoms.

Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-

3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)-(c), 416.929(b)-(c).

First, the ALJ looks for objective medical evidence showing a condition that could reasonably

produce the alleged symptoms, such as pain.[16] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the

ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c),

416.929(c). In making that determination, the ALJ must "examine the entire case record,

---

[15] Mark's argument that the ALJ impermissibly weighed medical opinion evidence is discussed in Part B of this Report & Recommendation and will not be repeated in full here.

[16] SSR 16-3P states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." See Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Mar. 16, 2016). Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

including the objective medical evidence; an individual's statements about the intensity,
persistence, and limiting effects of symptoms; statements and other information provided by
medical sources and other persons; and any other relevant evidence in the individual's case
record." Id.

The ALJ's opinion includes a discussion of Mark's medical history, along with Mark's
own allegations, and the ALJ adequately supported his finding that Mark's allegations were not
entirely consistent with the medical evidence and other evidence in the record. In summarizing
the evidence, the ALJ specifically noted Mark's testimony that he is "unable to perform less
stressful types of work because he would be unable to handle working under any time
constraints," that he is "very forgetful and distractible," sometimes forgetting "people's names
and . . . words." R. 22. Further, contrary to Mark's assertion that the ALJ ignored evidence
regarding his problems with memory, anxiety and depression, the ALJ specifically cited Mark's
claims that both his depression and memory have worsened over time, drawing from both
Mark's testimony and the treatment notes of Dr. Leggett and Mr. Salzbach. Id.

Ultimately, however, the ALJ concluded that Mark's "medically determinable
impairments could reasonably be expected to produce the [] alleged symptoms; however,
[Mark's] statements concerning the intensity, persistence, and limiting effects of these symptoms
are not entirely consistent with the objective medical evidence and other evidence in the record."
R. 23. The ALJ noted that despite claims of increased depression, anxiety, and memory
problems, Mark's overall course of treatment has been conservative: he generally takes the same
medications he took on the alleged onset date; he has not required inpatient stabilization; and, he
has maintained a consistent, quarterly psychiatric treatment schedule since early 2016 with no
increase in appointments. R. 24. The ALJ cited several specific records where Mark indicated

18

that he wanted to remain on his current treatment plan. Id. The ALJ also referenced several

treatment reports from 2017 and 2018 suggesting that Mark had a stable mood and a generally

functional memory.[17] See R. 24–25. The ALJ found that evidence regarding Mark's activities of

daily living and occasional commentary about seeking employment support the conclusion that

he is capable of unskilled work. R. 25–26.

Mark points to Brown, 873 F.3d 251, to support his argument that the ALJ does not

explain how his various activities of daily living show that he is capable of completing a full

workday. Pl.'s Br. at 30-31, Dkt. 9. However, this case is distinguishable from Brown, where the

Fourth Circuit concluded that the ALJ had committed multiple errors, including failing to

acknowledge the extent of the daily activities of living, writing:

> With respect to the first reason for the adverse credibility finding, the ALJ noted
> that Brown testified to daily activities of living that included "cooking, driving,
> doing laundry, collecting coins, attending church and shopping . . . The ALJ did
> not acknowledge the extent of those activities as described by Brown, e.g., that he
> simply prepared his meals in his microwave, could drive only short distances
> without significant discomfort, only occasionally did laundry and looked at coins,
> and, by the time of the second ALJ hearing, had discontinued regular attendance
> at church and limited his shopping to just thirty minutes once a week. Moreover,
> the ALJ provided no explanation as to how those particular activities—or any of
> the activities by Brown—showed that he could persist through an eight-hour
> workday.

873. F.3d at 263. Here, unlike Brown, the ALJ clearly understood Mark's limits in completing

his activities of daily living. See, e.g., R. 25, 28. The ALJ specifically acknowledged that Mark

participates in activities "depending on how he feels" and states that Mark "recently reported

difficulties learning new music," has put running "on hold due to a knee injury," and that he

---

[17] Mark specifically claims that "[t]he ALJ ignores the evidence of record from Dr. Leggett and Ronald
Salzbach, LCSW documenting [his] poor to variable functioning, his continued ruminative thought processes, and
continued anxious affect despite consistent treatment" and that Dr. Leggett noted Mark "functions better in a non-
stressful environment." These claims go to the ALJ's weight of the medical evidence—not the purported failure to
weigh Mark's subjective allegations. Nevertheless, the ALJ includes evidence from both Dr. Leggett and Mr.
Salzbach regarding symptoms of anxiety, depression, and mental ability and, additionally, acknowledges that
Mark's relief is, at best, "incomplete."

"trie[s]" to help out with chores.[18] R. 22. The ALJ also clearly indicated that Mark's

participation in multiple foreign and domestic trips were not everyday occurrences. See R. 25

(describing timeline of trips).

Further, unlike in Brown, the ALJ relied upon more than those daily activities to discount

Mark's subjective allegations. The ALJ noted that Mark's allegations were inconsistent with the

medical records, and that testing soon after Mark's alleged onset date showed he had normal or

slightly above normal cognition for his age. R. 19. Additionally, though memory problems were

regularly discussed in treatment records (especially around the time of Mark's alleged onset

date), by 2018, Dr. Leggett reported that Mark's "memory is generally functional in a non-

stressful environment." R. 24–25. The state agency doctors also found that despite some

difficulties with "complex or detailed instruction," Mark "would be able to recall short and

simple instructions." R. 26. The ALJ also weighed evidence that Mark's treatment remained

stable and consistent, that his treating doctors suggested a reasonably stable mood at multiple

2017 and 2018 appointments (and even "partial remission" of his bipolar disorder), and that

Mark's GAF scores suggested only moderate or mild symptoms. See 24–25 (citing Drs. Leggett

and Leong's treatment notes suggesting at least some level of mood stability). Finally, the ALJ

may properly rely on evidence regarding a claimant's routine, non-work activities in rejecting a

claim of disability.

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies

between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d

---

[18] Mark also raises his feelings of drowsiness due to his medication and his need "to lie down for about an hour every afternoon due to fatigue." Pl.'s Br. at 30, Dkt. 9. The ALJ addressed these claims, noting that by Mark's own admission his drowsiness may be linked to afternoon caffeine intake. R. 24. The ALJ further noted that several preceding and later appointments that Mark reported no new medication side effects. Id.

635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Mark's subjective complaints with substantial evidence, and that Mark is capable of performing work at the level stated in the ALJ's opinion.

## **CONCLUSION**

For the foregoing reasons, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment and **DENYING** Mark's Motion for Summary Judgment.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Entered:  February 16, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge